UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DACIA VOTOLATO,                )
                              )
        Plaintiff,            )    CIVIL ACTION NO.
                              )    16-cv-11663-DPW
                              )
v.                            )
                              )
VERIZON NEW ENGLAND, INC.,    )
                              )
                              )
        Defendant.            )

MEMORANDUM
October 1, 2018

Defendant Verizon New England, Inc. seeks summary judgment against claims by Plaintiff Dacia Votolato that Verizon is responsible for a retaliatory hostile work environment, orchestrated her constructive discharge, and engaged in deceit and negligent misrepresentation regarding long-term disability benefits available to her. I have granted the motion as to the retaliatory hostile work environment and constructive discharge claims. But because genuine issues of material fact remain regarding the claims sounding in misrepresentation, I have denied Verizon's motion regarding misrepresentation of available benefits. This Memorandum provides a detailed explanation for those decisions.

## I. BACKGROUND

### A.   *Factual Background*

I summarize the facts in the light most favorable to Ms. Votolato as the party opposing summary judgment. *See Lehman* v. *Prudential Ins. Co. of Am.*, 74 F.3d 323 (1st Cir. 1996). Notably, Ms. Votolato has not filed a response to the facts set forth in Verizon's Rule 56.1 statement of undisputed material facts.  Rather, while providing her own "statement of material facts of record," she cites to Verizon's facts throughout her opposition.  Accordingly, uncontroverted facts of record supplied by Verizon are deemed admitted. *See* Local Rule 56.1.

### 1.   The Parties

Plaintiff Dacia Votolato began working for Defendant Verizon New England, Inc. in 1996 and she was assigned to an office in Providence, Rhode Island.  She was employed as a telephone operator and was a member of the union.  In approximately 2004, Ms. Votolato transitioned from an office in Providence to an office in Fall River, Massachusetts, where she remained through the rest of her employment.  At all times relevant to this matter, Ms. Votolato was supervised by Kellie Machado and Sara Mendes, two first-level managers, who in turn reported to Cindy Malone, a second-level manager.

### 2.   The Larry Lastra Sexual Harassment Incident

In January 2015, Ms. Votolato reported to Ms. Mendes

concerns that a coworker and fellow union member, Larry Lastra, had engaged in behavior in December 2014 that could constitute sexual harassment.  Ms. Votolato admits that she did not want to report Mr. Lastra's behavior, but rather claims that Ms. Mendes "made" her provide details about Mr. Lastra's behavior once she indicated that Mr. Lastra had acted inappropriately.  In her own words, Ms. Votolato felt like a "traitor" to Mr. Lastra, describing "snitch[ing] on someone [in the union]" as a "very uncool thing to do."  In any event, Ms. Votolato acknowledges that Verizon took her concerns seriously.  Mr. Lastra was suspended promptly and Verizon's Security Department launched an investigation into his behavior.  As a result of that investigation, Verizon terminated Mr. Lastra's employment.

  3.   The Alleged Retaliatory Acts

  Beginning in the end of March 2015, Ms. Votolato contends that her coworkers subjected her to a hostile work environment because of her complaint about Mr. Lastra.  Ms. Votolato was out of the office on a leave of absence from January through March and acknowledges that no act of purported retaliation occurred during that time.

  In the aftermath of reporting her concerns about Mr. Lastra's behavior, Ms. Votolato texted frequently with her direct supervisor, Ms. Machado.  She expressed concerns about her fellow union members' retaliating against her because of her

complaint.  Ms. Machado responded compassionately to these messages, both through text messages to Ms. Votolato and in telephone and in-person conversations.  Ms. Machado repeatedly assured Ms. Votolato that there was value in what she reported and Ms. Machado further offered to help her in any way she might think she needed.

Ms. Votolato claims that her complaint against Mr. Lastra was almost like "Public Knowledge."  In particular, she maintains that Ms. Machado reported in front of two employees at the Fall River Verizon office that Ms. Votolato contended Mr. Lastra had exposed himself and that he had shown a picture of a penis on a keyboard to Ms. Votolato.

According to Ms. Votolato, after the incident with Mr. Lastra, her coworkers "just gave [her] the cold shoulder." Furthermore, she claims that several of her coworkers "unfriended" her on Facebook and that Mr. Lastra posted comments on Facebook which she found upsetting, though she acknowledges that Verizon does not have control over what people post on their personal Facebook pages.

Additionally, Ms. Votolato contends that coworkers who were assigned to the "in charge" desk were not addressing her concerns as quickly as they had in the past, however she concedes that she has no evidence that her job was impacted adversely by this circumstance.  Employees assigned to the "in

4

charge" desk monitor the workflow in the office and ensure that
the employees take their breaks as required under the union
contract.  The employees assigned to the "in charge" desk,
however, are union members who do not participate in hiring,
firing, disciplining, or evaluating employees; only Verizon
management, none of which are assigned to the "in charge" desk,
conducts those functions.  Simply put, the "in charge" desk
employees are peers to the other union members in the office.

Ms. Votolato further alleges that she was subjected to
"numerous little slights."  For example, Ms. Votolato maintains
that other employees would give her "dirty" or even "menacing"
looks.  She states one coworker "let the door slam in [her]
face" when she was entering the Fall River facility behind the
coworker one day.  Moreover, Ms. Votolato claims that one of her
coworkers tried to run her over with a car in the parking lot,
but she concedes that this allegation is based solely on her
observation that the employee was driving fast in the parking
lot and on her "vibe" that the coworker did not like her.
Nevertheless, Ms. Votolato reported this incident to Ms.
Machado, who, according to Ms. Votolato, "blew it off as [the
coworker's] normal driving."  Ms. Votolato, however, maintains
that she had seen the same coworker leave the parking lot before
and she did not drive that quickly.  Meanwhile, Ms. Votolato
reported lights being out in the parking lot, and Ms. Machado

told her they would be fixed immediately but they were not.  She then went to Elaine Coulombe, a service assistance supervisor, who got the lights fixed as it related to her safety.

Ms. Votolato further claims that on one occasion, a coworker stated, "Oh, someone call security," when she entered the lunchroom.  Additionally, she alleges that one of her coworkers called her "sneaky" on one occasion.  On another occasion, when a coworker hugged her someone said, "Oh, you're [sic] hugging her?"  A friend advised her via text regarding the atmosphere at work: "[T]ry to control yourself and keep your cool because they want to make you look crazy and get Larry his job back."

Ms. Machado made a point to be present when Ms. Votolato was gathering with other union employees, to make sure no one was treating her poorly.  This strategy was recommended to Ms. Machado by Verizon's Human Resources department in response to the text messages that Ms. Votolato had sent Ms. Machado.  Ms. Machado, however, did not witness any improper conduct toward Ms. Votolato from her fellow union members.  In any event, Ms. Machado asked Ms. Votolato to provide her with the names of the individuals she was referring to and examples of the behavior she was concerned about, but Ms. Votolato refused to provide Ms. Machado with any details.

Ms. Votolato generally considered Ms. Machado to be supportive of her, nevertheless believing that Ms. Machado contributed to the alleged hostile work environment when she purportedly tried to "fluff" off her accusation that a coworker had tried to run her over in the parking lot.

### 4.   The Facebook Post

In April 2015, while Ms. Votolato was on a leave of absence from Verizon, she wrote a Facebook post that came to the attention of her employer.  The message said something like, "To all the Larry sympathizers: Did it ever occur to you he might have hurt someone?  There are two sides to every story.  Would it make you feel better if I blow my brains out?  You got it."

In response, Cindy Malone contacted Ms. Votolato directly and encouraged her to seek assistance from Verizon's Employee Assistance Program ("EAP").  After speaking with Ms. Votolato, Ms. Malone reached out to the EAP for assistance.  Ms. Malone provided the EAP representative with Ms. Votolato's phone number and asked if she would call Ms. Votolato.  Because the EAP representative could not reach Ms. Votolato, Ms. Malone contacted the local police to perform a wellness check, which confirmed that Ms. Votolato was safe.

Ms. Votolato says Verizon suspended her for two weeks in June 2015 allegedly because she lacked sufficient available FMLA leave.

### 5.   The Christopher Williams Retaliation Incident

In approximately July 2015, Christopher Williams, a fellow union member, reported to the union business manager, Rita Sweeny, who is not a Verizon employee, that Ms. Votolato had shown him a cell phone video of a naked man in a hot tub. According to Ms. Votolato, Ms. Sweeny then called her and yelled at her regarding the incident.  Ms. Sweeny specifically said, "Because of you we have someone out on the street. . . .  You went running to management.  We're like a family.  We have our way of working things out."  When Ms. Votolato went to Mr. Williams to ask why he had reported the matter to Ms. Sweeny, Mr. Williams allegedly responded, "Really?  After what you did to Larry, you deserve this."

Upset by this remark, Ms. Votolato reported it to Ms. Mendes.  Ms. Mendes allowed Ms. Votolato to leave work for the rest of the day and immediately spoke with Mr. Williams to remind him about Verizon's anti-retaliation policy.  Ms. Malone also spoke with Mr. Williams regarding the incident. Ultimately, Mr. Williams, conceding that there was nothing of a sexual nature in the bathtub video, did not file an internal complaint with Verizon, Ms. Votolato faced no disciplinary action as a result of the incident, and she acknowledges that Verizon did the right thing in response to her concerns about Mr. Williams.

Ms. Votolato states that following the incident with Mr. Williams, she was placed on a six-month job-in-jeopardy status for missing time out of work without adequate FMLA hours.

### 6.   Ms. Votolato's Reporting of Retaliation

Although Verizon's Code of Conduct expressly forbids retaliation for initiating internal complaints, Ms. Votolato never raised concerns about anything approaching express retaliation, other than reporting the incident with Mr. Williams to Ms. Mendes.  She concedes that she did not report any of the allegedly "subtle harassment" to management at Verizon.

### 7.   Ms. Votolato's Leave of Absence and Disability Benefits

Ms. Votolato acknowledges that no acts of purported retaliation occurred at any time after August 15, 2015.  She ultimately went out on a leave of absence as of September 21, 2015.  Ms. Votolato received short-term disability benefits under Verizon's Sickness Disability Benefits Plan during this absence.  However, her short-term disability benefits were set to expire on July 9, 2016.

In anticipation of Ms. Votolato's reaching the maximum benefit period allowed under the terms of the Sickness Disability Benefits Plan, Ms. Malone sent Ms. Votolato a letter on June 3, 2016, describing her options upon exhaustion of her Sickness Benefits.  Ms. Malone informed Ms. Votolato that these

options were (1) to request a further leave of absence; (2) to request a workplace arrangement or accommodation that would facilitate her return to work (for which the required paperwork was attached); or (3) to return to work.  The letter stated that unless Ms. Votolato acted on the letter by returning to work or pursuing another option, she "[might] face possible termination by Verizon effective 7/9/2016."  Ms. Votolato did not respond to this letter.  Verizon, nevertheless, did not terminate Ms. Votolato's employment immediately after her Sickness Disability benefits expired.

Instead, Ms. Malone sent Ms. Votolato a second letter on July 12, 2016, to inquire about her status.  In that letter, Ms. Malone advised Ms. Votolato that she could apply for long-term disability benefits.  A prior long-term disability claim had been closed because Ms. Votolato failed to submit the required information to MetLife.  Ms. Malone also offered Ms. Votolato the opportunity to return to work and again offered to discuss any workplace arrangement or accommodation that could help Ms. Votolato return.  In response to this letter, Ms. Votolato did not contact Ms. Malone but rather pursued long-term disability benefits from MetLife.

MetLife administers Verizon's short-term and long-term disability benefits plans.  It is MetLife, not Verizon that determines whether an employee is eligible for either short-term

or long-term disability benefits based on a medical condition. Eventually, Ms. Votolato submitted a formal application for long-term disability benefits.

While Ms. Votolato's application for long-term disability benefits was pending, Kathryn Schindelar, a member of Verizon's Workplace Accommodations Team, reached out to Ms. Votolato to discuss her return to work status.  In a letter dated July 22, 2016, Ms. Schindelar advised Ms. Votolato that if she were to accept long-term disability benefits approved by MetLife, she would need to separate from Verizon's payroll because that is what the Long-Term Disability Benefits Plan requires. Alternatively, Ms. Schindelar offered to discuss potential "workplace arrangements" that would allow Ms. Votolato to return to work.

Ms. Schindelar followed her letter with a phone call with Ms. Votolato.  According to Ms. Votolato, Ms. Schindelar stated that Ms. Votolato was "going to get approved" for long-term disability benefits from MetLife.  Ms. Votolato specifically testified that Ms. Schindelar spoke "so authoritatively" that it seemed "she was the final word" and "there was unequivocally no doubt in either of our mind[s] that this was approved."  Ms. Votolato's psychologist, Dr. William Hancur, who was on the call as well, also recalled an apparently definitive statement from Ms. Schindelar.  Dr. Hancur recalled that during that same call

Ms. Schindelar told him "that Ms. Votolato had been granted long-term disability by MetLife and that we would – that she could then – we could then go forward with that, you know, with that understanding."

Ms. Votolato resigned her employment with Verizon as of July 2016. Shortly thereafter, however, Ms. Votolato learned that MetLife had denied her application for long-term disability benefits. Despite this denial, Ms. Votolato made no effort to return to work at Verizon. Regardless of the status of her long-term disability benefits application, Ms. Votolato described herself, as of July 2016, as a "mess" who "probably would not have been able to return to work." In fact, she admits that she "never pursued" a return to work at Verizon after her short-term disability benefits had expired in early July 2016.

## B. Procedural Background

On June 6, 2016, Ms. Votolato filed this action in the Suffolk Superior Court seeking redress for claims of: sexual discrimination and sexual harassment in violation of Mass. Gen. Laws ch. 151B, §§ 4(1) and (16A) and Title VII of the Federal Civil Rights Act, hostile work environment in retaliation in violation of Mass. Gen. Laws ch. 151B, § 4 and Title VII; aiding and abetting discrimination in violation of Mass. Gen. Laws ch. 151B, §§ 4(4A) and 4(5); and termination and constructive

discharge in violation of Mass. Gen. Laws ch. 151B and Title
VII.

Verizon filed a Notice of Removal, resulting in the
transfer of the case to this Court on August 16, 2016.  On
August 23, 2016, Verizon filed a Partial Motion to Dismiss for
failure to state a claim on the sexual harassment and sexual
discrimination and aiding and abetting discrimination counts.

On September 12, 2016, Ms. Votolato filed an amended
complaint, which included claims from her initial complaint:
hostile work environment and retaliation in violation of Mass.
Gen. Laws ch. 151B, § 4 and Title VII; termination and
constructive discharge in violation of Mass. Gen. Laws ch. 151B
and Title VII; and for the first time, fraud based on deceit and
negligent misrepresentation regarding benefits.  Verizon
answered the amended complaint on September 26, 2016.  As a
consequence, I issued an order finding Verizon's earlier motion
to dismiss the original complaint moot and the parties proceeded
to discovery, at the conclusion of which Verizon filed the
motion for summary judgment now before me.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party

13

is entitled to a judgment as a matter of law." *Sanchez* v. *Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996) (quoting Fed. R. Civ. P. 56(c)).  A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Id*.  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, . . . would permit a rational factfinder to resolve the issue in favor of either party." *Medina–Munoz* v. *R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (internal citations omitted).

Therefore, to succeed on a summary judgment motion, "the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers* v. *Fair*, 902 F.2d 140, 143 (1st Cir. 1990).  In order to preclude summary judgment, the nonmoving party must submit "sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." *LeBlanc* v. *Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018, 114 S. Ct. 1398 (1994) (internal quotations and citations omitted).

## III. ANALYSIS

### A.   *Retaliatory Hostile Work Environment Claim*

It is well-established that "[b]oth Title VII and chapter 151B contain provisions that make it unlawful for employers to retaliate against persons who complain about unlawfully

14

discriminatory employment practices." *Noviello* v. *City of Bos.*, 398 F.3d 76, 88 (1st Cir. 2005).  In order to establish a claim for retaliation under either statute, "a plaintiff must show that (i) she undertook protected conduct, (ii) she suffered an adverse employment action, and (iii) the two were causally linked." *Id.* (citing *Dressler* v. *Daniel,* 315 F.3d 75, 78 (1st Cir. 2003) (Title VII); *Sullivan* v. *Raytheon Co.,* 262 F.3d 41, 48 (1st Cir. 2001) (chapter 151B)).

The First Circuit has held that "workplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action sufficient to satisfy the second prong of the prima facie case for Title VII retaliation cases." *Noviello*, 398 F.3d at 89.  The *Noviello* court further held that "under Massachusetts law as under Title VII, subjecting an employee to a hostile work environment in retaliation for protected activity constitutes an adverse employment action." *Id.* at 91.  This holding was followed by a similar holding in *Clifton* v. *Mass. Bay Transp. Auth.,* 839 N.E.2d 314, 318 (Mass. 2005).  The Massachusetts Supreme Judicial Court there noted that "[a]lthough unlawful retaliation, typically, may involve a discrete and identifiable adverse employment decision (e.g., a discharge or demotion), it may also consist of a continuing pattern of behavior that is, by its insidious nature, linked to the very acts that make up a

claim of hostile work environment." *Id.* (citing *Noviello,* 398 F.3d at 89–91). Thus, a plaintiff may recover on a retaliatory hostile work environment claim when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Noviello*, 398 F.3d at 84 (quoting *Harris* v. *Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).

Here, there is no dispute that Ms. Votolato engaged in protected activity by reporting her concerns about Mr. Lastra, Verizon concedes this much. [Dkt. No. 29 at 10]. The parties instead dispute whether the second and third elements of a retaliation claim are satisfied.

1. <u>Disputed Retaliation Claim</u>

Ms. Votolato relies upon a series of incidents that she contends amount to a hostile work environment. Nevertheless, before it can be actionable, "[a]n allegedly retaliatory act must rise to some level of substantiality . . . ." *Noviello*, 398 F.3d at 92. As a result, Ms. Votolato "must show that she was subjected to severe or pervasive harassment that materially altered the conditions of her employment." *Id.*

Moreover, the harassing environment "must be both objectively and subjectively offensive, one that a reasonable

person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher* v. *City of Boca Raton*, 524 U.S. 775, 787, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). "In determining whether a reasonable person would find particular conduct hostile or abusive, a court must mull the totality of the circumstances, including factors such as the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Noviello*, 398 F.3d at 92 (quoting *Faragher*, 524 U.S. at 787-88, 118 S. Ct. 2275); *see also Alvarado* v. *Donahoe*, 687 F.3d 453, 458-59 (1st Cir. 2012) ("That a series of minor retaliatory actions may, when *considered in the aggregate*, satisfy the *McDonnell Douglas* prima facie 'adverse action' requirement, is settled law in this Circuit.") (emphasis added).

The First Circuit has noted that "if protected activity leads only to commonplace indignities typical of the workplace (such as tepid jokes, teasing, or aloofness), a reasonable person would not be deterred from such activity . . . [because] an employee reasonably can expect to encounter such tribulations even if she eschews any involvement in protected activity." *Noviello*, 398 F.3d at 92. Rather, "[t]he very act of filing a charge against a coworker will invariably cause tension and

result in a less agreeable workplace." *Id*. at 93.   As a
result, "rudeness or ostracism, standing alone, usually is not
enough to support a hostile work environment claim." *Id*. at 92;
*see also Alvarado*, 687 F.3d at 461 (quoting *Gómez-Pérez* v.
*Potter*, 452 F. App'x. 3, 9 (1st Cir. 2011) ("a string of trivial
annoyances will not suffice to make an adverse action showing:
'the alleged harassment must be severe or pervasive'") (internal
quotations omitted).   Nevertheless, "severe or pervasive
harassment in retaliation for engaging in protected activity" is
unacceptable under Title VII and chapter 151B.  *Noviello*, 398
F.3d at 92.

The First Circuit's *Noviello* decision is instructive on how
such an analysis should proceed.  First, the *Noviello* court
identified conduct that could not be considered as contributing
to a retaliatory hostile work environment, that is, "those
actions that are hurtful to a complainant only because coworkers
do not take her side in a work-related dispute." *Noviello*, 398
F.3d at 93.  It then identified conduct that could properly be
considered in the analysis: "those actions, directed at a
complainant, that stem from a retaliatory animus." *Id*.

The *Noviello* court ultimately concluded that the evidence
in the case "would permit—although certainly not compel—a
reasonable jury to find that the plaintiff was subjected to a
retaliation-based hostile work environment." *Noviello*, 398 F.3d

at 93.   In reaching its conclusion, the *Noviello* court took
"into account the relative ubiquity of the retaliatory conduct,
its severity, its natural tendency to humiliate (and, on
occasion, physically threaten) a reasonable person, and its
capacity to interfere with the plaintiff's work performance."
*Id*.   That level of severe or pervasive harassment is not present
in the record before me here.   This case is one which falls
below the heightened "severe or pervasive" threshold.   The very
act of Ms. Votolato's report against Mr. Lastra invariably
caused tension and resulted in a less agreeable workplace,
nothing more.

For example, although Ms. Votolato was falsely accused of
misconduct like the plaintiff in *Noviello*, *see Noviello*, 398
F.3d at 93, no formal complaint was filed with Verizon and Ms.
Votolato did not face any disciplinary action as a result of the
incident.   Rather, Ms. Mendes immediately spoke with Mr.
Williams to remind him about Verizon's anti-retaliation policy.
Ms. Malone, Ms. Votolato's second-level manager, also got
involved and spoke with Mr. Williams regarding the incident.
Ms. Votolato even acknowledges that Verizon did the right thing
in response to her concerns about Mr. Williams.   Additionally,
although "work sabotage, exclusion, [and] denial of support" may
contribute to the creation of a hostile work environment, *see
Noviello*, 398 F.3d at 93, Ms. Votolato's allegation that

coworkers who were assigned to the "in charge" desk were not addressing her concerns as quickly as they had in the past, is unavailing as she concedes that she has no evidence that her job was impacted adversely.

Furthermore, in *Noviello*, one of the plaintiff's coworkers, who continuously tormented the plaintiff, also "placed the plaintiff at risk of physical harm by coming close to striking her with a van." *Noviello*, 398 F.3d at 94.  The court noted that "if that was intentional[,] . . . it [wa]s a cogent indicator of an adverse change in the conditions of the plaintiff's employment." *Id.*  At first glance, Ms. Votolato's allegation that a coworker attempted to run her over in the Verizon parking garage seems similar to the incident in *Noviello*.  However, I find the argument unpersuasive here principally because Ms. Machado looked into the incident by speaking to the coworker's husband, who informed Ms. Machado that "that's the way [the coworker] drives."

As for the rest of Ms. Votolato's allegations, I find them to be unconvincing as well.  In *Alvarado*, the First Circuit noted that although the plaintiff's coworkers' "taunting and mocking comments were both callous and objectionable . . . they [did] not constitute the severe or pervasive adverse conduct that the case law recognizes as 'discriminatory changes in the terms and conditions of employment,' . . . sufficient to

20

'establish an objectively hostile or abusive work environment.'" *Alvarado*, 687 F.3d at 462 (internal quotations and citations omitted).  Additionally, my colleague Judge Hillman has recognized that "[u]nanimous authority holds . . . that a [p]laintiff who is shunned or subjected to the silent treatment after reporting sexual harassment has not suffered a materially adverse employment action." *Thirkield* v. *Neary & Hunter OB/GYN, LLC*, 76 F. Supp. 3d 339, 350-51 (D. Mass. 2015).  More generally, the Supreme Court has acknowledged that "simple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788, 118 S. Ct. 2275 (internal quotations and citations omitted).

Accordingly, the facts that certain of Ms. Votolato's coworkers gave her the cold shoulder, made dirty or menacing looks at her, called her "sneaky," or "unfriended" her on Facebook, do not individually or together amount to what the law recognizes as discriminatory changes in the terms and conditions of employment sufficient to establish an *objectively* hostile or abusive work environment.  In sum, even taking the aggregate facts of record in the light most favorable to Ms. Votolato, I cannot conclude that a jury could rationally find that she was

subjected to a hostile work environment arising out of
retaliation for her complaint against Mr. Lastra.

Verizon further argues that Ms. Votolato fails to establish
a causal link between her report and the claimed harassment
because she "offers nothing beyond her own speculation to even
connect the alleged hostile work environment to her complaints
about Mr. Lastra."  In support of this contention, Verizon cites
*Gourdeau* v. *City of Newton*, No. 13-12832-LTS, 2016 WL 4975192
(D. Mass. Sept. 16, 2012).  Judge Sorokin in *Gourdeau* found that
the plaintiff had "not submitted evidence supporting her
personal knowledge of the causation connection or any other
basis to draw[] the inference[;] [although the plaintiff had]
personal knowledge that the friendships soured; she ha[d] not
advanced evidence regarding why they soured."  *Id*. at *1.

Only the incident with Mr. Williams involved a specific
reference to Ms. Votolato's complaint about Mr. Lastra.  I
recognize that "[s]ometimes the temporal sequence of events may
support a causation inference." *Gourdeau,* 2016 WL 4975192, at
*1.  Assuming for the moment that this complaint can be said to
have caused hostility by Ms. Votolato's coworkers and is
sufficient to support Ms. Votolato's retaliatory hostile
environment claim generally, I turn to whether Ms. Votolato has
established a causal connection sufficient to support
responsibility on the part of Verizon.

2.   Verizon's Responsibility for a Hostile Work
      Environment

It is well-settled that "[w]hen a supervisor creates a
hostile work environment, the employer is vicariously liable for
it, subject, however, to a possible affirmative defense."
*Noviello*, 398 F.3d at 94.  This defense consists of two
elements, which, if proven, permit the employer to escape
liability.  *Id*.  "First, the employer must show that it
'exercised reasonable care to prevent and correct promptly' the
harassment."  *Id*. (quoting *Burlington Indus., Inc.* v. *Ellerth,*
524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633
(1998)).  "Second, the employer must show that the employee
'unreasonably failed to take advantage of any preventive or
corrective opportunities provided by the employer or to avoid
harm otherwise.'"  *Id.* at 95 (quoting *Ellerth,* 524 U.S. at 765,
118 S. Ct. 2257).  The First Circuit, however, has held that
this type of affirmative defense is not "available under chapter
151B to an employer whose supervisors create a retaliatory
hostile work environment."  *Id*.

In any event, "[w]hen coworkers, rather than supervisors,
are responsible for perpetuating a hostile work environment, 'an
employer can only be liable if the harassment is causally
connected to some negligence on the employer's part.'"  *Espinal*

v. *Nat'l Grid NE Holdings 2, LLC*, 794 F. Supp. 2d 285, 294 (D.
Mass. 2011) (quoting *Noviello*, 398 F.3d at 95).   "Typically,
this involves a showing that the employer knew or should have
known about the harassment, yet failed to take prompt action to
stop it."  *Noviello*, 398 F.3d at 95.

Ms. Votolato contends that the "managers, who were
responsible for policing the work place, made no attempt to keep
[her] complaint of harassment by Larry Lastra quiet."  She
maintains that the managers "[i]n fact, [] did the opposite,
[Verizon], by its managers, attempted to set up a situation
where retaliation would occur against [Ms. Votolato]."  I find
this argument unpersuasive.  In fact, Ms. Votolato admits that
she did not report any of the allegedly "subtle harassment" to
management at Verizon.  However, when she did come forward,
Verizon acted promptly and appropriately.  This case is unlike
*Noviello* where the plaintiff complained to supervisors about the
negative treatment from coworkers and, in turn, those
supervisors either took no action or provided fruitless
suggestions to the plaintiff.  *See Noviello*, 398 F.3d at 82-83.

Furthermore, it is undisputed that Ms. Machado was
available to Ms. Votolato and was responsive to her concerns.
Ms. Machado shadowed Ms. Votolato to make sure no one was
treating her poorly.  Yet, Ms. Machado did not witness any
improper conduct toward Ms. Votolato from her fellow union

members.   Notwithstanding her lack of observation of improper
conduct, Ms. Machado asked Ms. Votolato to provide her with the
names of the individuals she was referring to and examples of
the behavior she was concerned about, but Ms. Votolato refused
to provide Ms. Machado with any details.   The record is clear
that what Verizon knew about from its supervisors resulted in
prompt and reasonable action to stop it.   It is clear that upon
this record Ms. Votolato has not, as a matter of law,
established a claim against Verizon for a retaliatory hostile
work environment.

## B.   *Constructive Discharge*

Verizon argues that Ms. Votolato's constructive discharge
claim fails essentially because her hostile work environment
claim fails.   Ms. Votolato, for her part, concedes that a
successful constructive discharge claim "entails something more"
than a mere hostile work environment claim: the plaintiff "must
show working conditions so intolerable that a reasonable person
would have felt compelled to resign."  *Penn. State Police* v.
*Suders*, 542 U.S. 129, 147 (2004).

Verizon's broader argument on constructive discharge is
persuasive.   It contends that Ms. Votolato has an obligation
"not to assume the worst, and not to jump to conclusions too
fast" with regard to whether her working conditions were so
intolerable that resignation was the only true option.   *Zemrock*

v. *Yankee Candle Co., Inc.*, No. 14-cv-30107-KAR, 2017 WL 506249, at *9 (D. Mass. Feb. 7, 2017).  "The standard is an objective one; it 'cannot be triggered solely by the employee's subjective beliefs, no matter how sincerely held.'"  *Marrero* v. *Goya of P.R., Inc.*, 304 F.3d 7, 28 (1st Cir. 2002) (citing *Suarez* v. *Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000)).

In *EEOC* v. *Kohl's Dep't Stores, Inc.*, 774 F.3d 127 (1st Cir. 2014), the First Circuit took the view that "a reasonable person would simply not feel 'compelled to resign' when her employer offered to discuss other work arrangements with her." *Id.* at 134-35 (citing *EEOC* v. *Sears, Roebuck & Co.*, 233 F.3d 432, 441 (7th Cir. 2000)).  In *Kohl's*, the plaintiff was twice asked to discuss accommodations and twice declined.  *See id*.  Similarly here Ms. Votolato was offered the opportunity to discuss accommodations with Verizon at least three times: in two letters dated June 3 and July 12, 2016 from Ms. Malone, and in a letter from Ms. Schindelar dated July 22.  At no time did Ms. Votolato engage Verizon in such discussions.  Nor does she adduce any evidence that suggests these were anything other than appropriate outreach efforts to Ms. Votolato on the part of Verizon.

I conclude Ms. Votolato's constructive discharge claim fails the "reasonable person" standard and does not survive summary judgment.

C.    *Deceit and Negligent Misrepresentation*

As to the fraud counts based on deceit and negligent misrepresentation, Verizon argues that Plaintiff's claim fails on multiple grounds.  Because the two torts differ only in the scienter required, and scienter is not at issue at this stage in the proceedings, I discuss the two claims together.  *See Rodowicz* v. *Mass. Mut. Life Ins. Co.*, 279 F.3d 36, 42 (1st Cir. 2002).

It is well-established that "[u]nder Massachusetts law, claims of fraudulent and negligent misrepresentation require a false representation of material fact, knowledge of falsity or carelessness on the part of the defendant, and a reasonable reliance by the plaintiff."  *Brennan* v. *GTE Gov't Sys. Corp.*, 150 F.3d 21, 30 (1st Cir. 1998).  The speaker need not know the statement is false if "the truth is reasonably susceptible of actual knowledge," or accurate facts are available to the speaker through "a modicum of diligence."  *Rodowicz*, 279 F.3d at 42.  However, the general rule in Massachusetts is that "statements promissory in nature" and "statements of conditions to exist in the future" are not actionable.  *Nationwide Book Indus., LLC* v. *Weiss*, No. 11-12195-JGD, 2013 WL 5740883, at *13 (D. Mass. Oct. 21, 2013) (quoting *Bolen* v. *Paragon Plastics, Inc.*, 754 F. Supp. 221, 226 (D. Mass. 1990)).

There is a material issue of fact as to what Ms. Schindelar said about the benefits that would be made available to Ms. Votolato.  Verizon contends that she said Ms. Votolato's benefits were "going to be approved."  This, it argues, cannot support a claim of misrepresentation because it is a statement about a future event not in the control of Verizon, but MetLife.

However, as Ms. Votolato observes in her statement of material facts, Dr. Hancur recalled a more definitive statement from Ms. Schindelar.  He recalled Ms. Schindelar stated that Ms. Votolato "had been granted long-term disability by MetLife and that we would — that she could then — we could then go forward with that, you know, with that understanding."  He also reported that his purpose in being on the call with Ms. Schinedelar was "to be certain of Ms. Votolato's understanding of what she was being told . . . ."

A reasonable jury could credit Dr. Hancur's recollection that Ms. Schindelar did make a definitive statement that Ms. Votolato was approved.  In light of this material factual dispute, the contested recollections regarding Ms. Schindelar's representations makes the terms of her statement inappropriate grounds for summary judgment.

Similarly unavailing is Verizon's argument that Ms. Votolato could not have reasonably relied on whatever statement was made.  Verizon seems to suggest that Ms. Votolato's

knowledge that MetLife would make the determination of
eligibility is decisive on this issue.  However, under
Massachusetts law, "the reasonableness of a party's reliance
ordinarily constitutes a question of fact for the jury." *Rodi*
v. *S. New Eng. Sch. of Law*, 389 F.3d 5, 16 (1st Cir. 2004).
Massachusetts courts ordinarily do not dispose of such issues on
summary judgment "unless the undisputed facts are so clear as to
permit only one conclusion." *Bryan Corp.* v. *ChemWerth, Inc.*,
No. 12-10466-MLW, 2015 U.S. Dist. LEXIS 63458, at *69 (D. Mass.
Apr. 2, 2015) (quoting *First Marblehead Corp.* v. *House*, 473 F.3d
1, 11 (1st Cir. 2006)).

This is not such a case.  Here, the record shows that Ms.
Votolato had received updates on the status of her MetLife case
from Verizon employees.  Ms. Malone's July 12, 2016 letter
stated: "MetLife has advised that you have now exhausted your
Short Term Disability, and that your Long Term Disability (LTD)
claim is closed due to failure to submit the LTD packet."  In
Ms. Schindelar's July 22, 2016 letter, however, she suggestively
wrote "that once MetLife has approved," Ms. Votolato would have
a benefit start date of July 10, 2016.  A reasonable jury could
find reasonable reliance based on that communication, in light
of the evidence of the parties' interactions as a whole.

Verizon also argues that Ms. Votolato could not have relied
on Ms. Schindelar's statement because she would have resigned

regardless.  Verizon's support for this view rests primarily on
Ms. Votolato's statement that when she applied for long-term
disability she was "a mess" and "probably would not have been
able to return to work."  It is bolstered by the fact that Ms.
Votolato did not take any action to return to work after her
short-term disability expired in July 2016.  When Ms. Malone
offered her the option of accommodation in the workplace or
filing for long-term disability via letter, Ms. Votolato filed
for disability, but did not otherwise respond.

Contesting this line of argument by Verizon, Ms. Votolato
argues that this too is an issue of fact on which a reasonable
jury could find in her favor.  That she "probably" would not
have been able to return to work at this point does not mean
that she would otherwise have terminated her employment
altogether.  Verizon seems to offer Ms. Votolato's statement as
an admission that Ms. Votolato did not rely on Ms. Schindelar's
representation.  But the probabilistic language a jury could
find Ms. Schindelar used weakens Verizon's argument and raises
the fact question, among others, whether Verizon had subtly set
Ms. Votolato up for failure by structuring potential long range
arrangements in a fashion that incentivized her resignation as a
way for Verizon to avoid actually paying long-term disability.

There is evidence in the record that suggests Ms. Votolato
was engaged in careful and agonizing deliberation about whether

to quit while she was in contact with Ms. Schindelar.  In her deposition Ms. Votolato recounts: "[B]ecause when I was talking to her on the phone, when she started calling me to pressure me to make my decision. . . . [I] was, like, well, can I sleep on it and she was, like, well, she almost didn't give me one night to sleep on it."  This summary of the interactions, which a reasonable jury could credit, casts doubt on Verizon's narrative that Ms. Votolato had her mind made up.

Tension between the parties' competing narratives based on the evidence of record presents issues properly to be resolved by a factfinder, rather than as a matter of law by the court on a motion for summary judgment.

## IV. CONCLUSION

For the reasons stated more fully above, I granted summary judgment to Verizon as to Ms. Votalato's claims for retaliatory hostile work environment and constructive discharge, and, finding that triable issues of fact remain as to the misrepresentation claims, denied summary judgment for Verizon as to misrepresentation.  The Clerk shall set this case for pre-trial conference.

*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE